USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:___3/27/20

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

Josefina Coronel, *et al.*,

                        Petitioners-Plaintiffs,

    –v–

Thomas Decker, *et al.*,

                        Respondents-Defendants.

20-cv-2472 (AJN)

OPINION & ORDER

ALISON J. NATHAN, District Judge:

Petitioners bring this writ of habeas corpus and complaint seeking immediate release from the custody of Immigration and Customs Enforcement (ICE). For the reasons that follow, the Court GRANTS their motion for a temporary restraining order, and orders Petitioners to be immediately RELEASED from immigration detention on conditions.

## I. BACKGROUND

The following facts are undisputed. Petitioners in this matter are civil immigration detainees, currently being held in the custody of Immigration and Customs Enforcement. Br. at 1.[1] Each of them "suffers from medical conditions that render them particularly vulnerable to severe illness or death if infected by COVID-19—vulnerabilities that are heightened in detention." *Id.* Petitioner Jose Otero has been detained in ICE custody for four months. Ostolaza Decl. ¶¶ 9-10. "Otero was the victim of a violent assault that forced him to have a

---

[1] This case was brought by seven habeas petitioners. After the petition was filed, ICE released three of the Petitioners. At oral argument, the parties agreed to limit this motion for emergency relief to the four Petitioners who remain in custody. *See* Mar. 26 Hr'g Tr. 6-7. The Court defers decision as to whether the habeas petition is moot as to the three out-of-custody Petitioners.

1

nephrectomy (removal of left kidney), partial liver resection, and left lung resection . . . As a result of having major organs of his body partially removed, his immune system is significantly compromised." Ostolaza Decl. ¶ 10. Petitioner Jose Madrid has been in ICE custody since January 2020. *Id.* ¶ 4. He suffers from type 2 diabetes and obesity. *Id.* ¶ 6. Petitioner Juan Morocho Sumba, who has been in ICE custody since December 2019, suffers from aortic valve disease, hypertension, and an enlarged heart. He has been unable to see a cardiologist in ICE custody even though he experiences ongoing chest pain. *See* Kim Decl. ¶¶ 23-25. Petitioner Miguel Miranda, who has been in ICE custody since February 2020, has type 2 diabetes and gastrointestinal problems. Ostolaza Decl. ¶¶ 14-17.

Petitioners allege that they face a uniquely serious medical risk from COVID-19, a global pandemic, due to their underlying health conditions. They note that each of these medical conditions alone places them in high-risk categories with respect to COVID-19. And that risk is further amplified because the conditions are "co-morbidities." Br. at 2. Moreover, Petitioners have represented in both their briefing and at the March 2 hearing that there have been confirmed cases at two of the three facilities where Petitioners are detained. *Id.*; Mar. 26 Hr'g Tr. at 52.

On March 20, 2020, Petitioners began this action by filing "a Petition for Writ of Habeas Corpus and Complaint for Injunctive Relief." *See* Dkt. No. 1. Their complaint alleges two claims for relief: first, that the Government violated their substantive due process rights by being deliberately indifferent to their medical needs, and second, that the Government violated their procedural due process rights by failing to provide them with an adequate bond hearing. Each petitioner also seeks habeas relief, requesting either immediate release or a bond hearing within 48 hours. *Id.* Petitioners then filed a motion for a temporary restraining order, seeking their immediate release from ICE custody. Dkt. No. 16. On March 25, 2020, Petitioners sought

emergency relief from the Court and submitted a proposed Order to Show Cause.  Dkt. No. 20.

Yesterday, the Court held oral argument on the motion now before the Court.  At oral argument,

the parties consented to resolution of this TRO motion on the factual record now before the

Court.  *See* Mar. 26 Hr'g Tr. at 4:10–5:18.

## II.  SEVERANCE

As a threshold matter, the Court considers the Government's argument that the claims of

the Petitioners should be severed and brought in separate habeas petitions rather than joined in a

single action.  While severance may be appropriate, the Court will not decide the issue at this

early stage of the litigation, on a motion for emergency relief, and without the benefit of full

briefing on the issue.  Considerations of judicial economy—the Court has already read and

digested the record and heard lengthy oral argument on this motion—and the urgent need to

timely decide Petitioners' motion for a temporary restraining order in light of the immediate risk

to the health of the Petitioners counsel against severance at this juncture.  *Cf. Golden Goose

Deluxe Brand v. Aierbushe*, No. 19-cv-2518 (VEC), 2019 WL 2162715, at *3–4 (S.D.N.Y. May

16, 2019) (declining to sever parties, even where the Court believed their joinder was improper,

prior to issuing a temporary restraining order because it concluded that doing so would not serve

judicial economy).

Because the Court did not receive briefing on this issue from Petitioners, the parties shall

meet and confer and propose a briefing schedule within three days of the date of this Opinion

and Order so that the Court may address severance going forward.

## III.  TEMPORARY RESTRAINING ORDER LEGAL STANDARD

"A preliminary injunction is an equitable remedy and an act of discretion by the court."

*Am. Civil Liberties Union v. Clapper*, 804 F.3d 617, 622 (2d Cir. 2015).  The same standard

governs consideration of an application for a temporary restraining order. *Andino v. Fischer*, 555 F. Supp. 2d 418, 419 (S.D.N.Y. 2008). In general, a party seeking a preliminary injunction or temporary restraining order "must . . . show a likelihood of success on the merits, a likelihood of irreparable harm in the absence of preliminary relief, that the balance of equities tips in the party's favor, and that an injunction is in the public interest." *Clapper*, 804 F.3d at 622 (citing *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008)). The burden on the moving party is even higher where, as here, a party seeks a mandatory injunction—that is, an injunction commanding a positive act, as opposed to one that merely maintains the status quo. The Second Circuit has instructed that a mandatory injunction "should issue 'only upon a clear showing that the moving party is entitled to the relief requested, or where extreme or very serious damage will result from a denial of preliminary relief.'" *Tom Doherty Assocs., Inc. v. Saban Entm't, Inc*., 60 F.3d 27, 34 (2d Cir. 1995) (quoting *Abdul Wali v. Coughlin*, 754 F.2d 1015, 1025 (2d Cir. 1985)).

## IV. IRREPARABLE HARM

"The showing of irreparable harm is '[p]erhaps the single most important prerequisite for the issuance of a" temporary restraining order. *Kamerling v. Massanari*, 295 F.3d 206, 214 (2d Cir. 2002) (quoting *Bell & Howell: Mamiya Co. v. Masel Supply Co.*, 719 F.2d 42, 45 (2d Cir. 1983)). Under this prong, parties seeking a temporary restraining order "must show that, on the facts of their case" and in the absence of the requested injunction, they will suffer a harm that "cannot be remedied after a final adjudication, whether by damages or a permanent injunction." *Salinger v. Colting*, 607 F.3d 68, 81–82 (2d Cir. 2010). In addition, the harm must be "neither

remote nor speculative, but actual and imminent." *Freedom Holdings, Inc. v. Spitzer*, 408 F.3d 112, 114 (2d Cir. 2005) (internal quotation marks and citation omitted).

Petitioners establish irreparable harm in two different ways. First, "the *alleged* violation of a constitutional right . . . triggers a finding of irreparable harm," *Jolly v. Coughlin*, 76 F.3d 468, 482 (2d Cir. 1996), and Petitioners allege in their petition that their substantive and procedural due process rights have been violated. Accordingly, "no further showing of irreparable injury is necessary." *Mitchell v. Cuomo*, 748 F.2d 804, 806 (2d Cir. 1984) ("When an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary.").

Second, irreparable harm exists where, as here, petitioners "face imminent risk to their health, safety, and lives." *Henrietta D. v. Giuliani*, 119 F. Supp. 2d 181, 214 (E.D.N.Y. 2000), *aff'd sub nom. Henrietta D. v. Bloomberg*, 331 F.3d 261 (2d Cir. 2003). Due to their serious underlying medical conditions, all Petitioners face a risk of severe, irreparable harm if they contract COVID-19. Indeed, an "[a]nalysis of close to 1,600 COVID-19 cases in China found that patients with at least one co-morbidity—including cardiovascular disease, diabetes and chronic kidney diseases—'had a 79% greater chance of requiring intensive care or a respirator or both, or of dying.'" Br. at 2 (quoting Sharon Begley, *Who is Getting Sick, and How Sick? A Breakdown of Coronavirus Risk by Demographic Factors*, STAT NEWS (Mar. 3, 2020), https://www.statnews.com/2020/03/03/who-is-getting-sick-and-how-sick-a-breakdown-of-coronavirus-risk-by-demographic-factors/). Moreover, being in immigration detention places Petitioners at significantly higher risk of contracting COVID-19. Individuals in carceral settings are at a "significantly higher" risk of spreading infectious diseases. *See* Mishori Decl. ¶ 16. It is not possible to isolate immigration detainees from the outside world (including from staff and

vendors who may have been exposed to COVID-19), nor is it possible to isolate them from one

another. *See id.* ¶ 24, 34–35; Letter from Dr. Scott A. Allen, Professor, Univ. of Cal. Riverside

Sch. of Med. & Dr. Josiah "Jody" Rich, Professor, Brown Univ. to Bennie Thompson, Chairman,

House Comm. on Homeland Sec., et. al. 5 (Mar. 19, 2020). As a result, jails will struggle to

contain any eventual outbreak of COVID-19. *See* Mishori Decl. ¶¶ 19, 42–43. The imminence

of this risk is underscored by the fact that two of the three jails housing the remaining Petitioners

have confirmed cases of COVID-19. *See Velesaca v. Wolf*, No. 20-cv-1803 (AKH) (S.D.N.Y.

March 25, 2020), Declaration of Captain Jennifer Moon, Dkt. No. 57; March 26 Hr'g Tr. at

52:15–18.

## V. LIKELIHOOD OF SUCCESS ON THE MERITS OF SUBSTANTIVE DUE PROCESS CLAIM

### A. Legal Standard

The Eighth Amendment's Cruel and Unusual Punishment Clause prohibits the

Government from treating the medical needs of incarcerated individuals with deliberate

indifference. *See Estelle v. Gamble*, 429 U.S. 97, 103–04 (1976); *accord Charles v. Orange

Cty.*, 925 F.3d 73, 82 (2d Cir. 2019). The Eighth Amendment, however, does not apply to civil

detainees. Such individuals "have not been convicted of a crime and thus may not be punished

in any manner—neither cruelly and unusually nor otherwise." *Darnell v. Pineiro*, 849 F.3d 17,

29 (2d Cir. 2017) (quoting *Iqbal v. Hasty*, 490 F.3d 143, 168 (2d Cir. 2007)) (internal quotation

marks omitted). The Supreme Court has held, however, that "persons in civil detention deserve

at least as much protection as those who are criminally incarcerated." *Charles*, 925 F.3d at 82

(citing *Youngberg v. Romeo*, 457 U.S. 307, 321–22 (1982); *City of Revere v. Mass. Gen. Hosp.*,

463 U.S. 239, 244 (1983)). For federal civil detainees, those rights are cognized under the Fifth

Amendment's Due Process Clause. *Id.* The Due Process Clause thus prohibits the federal

government from being deliberately indifferent to the medical needs of civil detainees. "[D]eliberately indifferent conduct" directed towards civil detainees is "egregious enough to state a substantive due process claim." *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 849–50 (1998). And the Due Process Clause applies to "all 'persons' within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent." *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001).

Courts in the Second Circuit use a two-prong test to review such claims. *See Charles*, 925 F.3d at 85–86. On the first prong, Petitioners must show that they have serious, unmet medical needs. On the second, they must show that Defendants acted with deliberate indifference to these needs. *Id.*

### B. Petitioners Have Serious, Unmet Medical Needs

"The serious medical needs standard contemplates a condition of urgency such as one that may produce death, degeneration, or extreme pain." *Charles*, 925 F.3d at 86 (quoting *Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996)). "In most cases, the actual medical consequences that flow from the denial of care are highly relevant in determining whether the denial of treatment subjected the detainee to a significant risk of serious harm." *Id.*

Here, the Government does not challenge Petitioners' assertion that they have serious, unmet medical needs. And on this record, there is little room to make such an argument. As discussed above, the individual Petitioners have co-morbidities that make them particularly vulnerable if they contract COVID-19. For example, Petitioner Otero has had part of his lung removed, Ostolaza Decl. ¶¶ 9-10, rendering him especially vulnerable to the respiratory illness and distress caused by COVID-19. *See also id.* ¶¶ 6, 13–19; Kim Decl. ¶¶ 23–25. Petitioners therefore have a serious medical need to socially distance themselves from other individuals in

sanitary conditions, in order to avoid contracting the virus and thereby potentially suffering

"death, degeneration, or extreme pain."  Indeed, the Government does not dispute that the

Petitioners here are, due to their existing medical conditions, in a high-risk category for

experiencing serious injury and death from COVID-19.  Mar. 26 Hr'g Tr. at 22:12–14 ("I don't

think there's a basis for the government to dispute that in the record right now.").  Yet the

carceral setting in which they are detained means that preventative strategies like social

distancing are difficult to implement, thus creating a "significantly higher" risk for spread of

infectious diseases like COVID-19.  Mishori Decl. ¶¶ 16, 35.

Numerous Courts, including several in this District, have recognized the unprecedented

threat COVID-19 poses to detained individuals.  *See Basank v. Decker*, No. 20-cv-2518 (AT),

(S..D.N.Y. Mar. 26, 2020); *United States v. Stephens*, No. 15-cr-95 (AJN), 2020 WL 1295155, at

*2 (S.D.N.Y. Mar. 19, 2020) ("[I]nmates may be at a heightened risk of contracting COVID-19

should an outbreak develop."); *United States v. Garlock*, 18-cr-418, 2020 WL 1439980, at *1

(N.D. Cal. Mar. 25, 2020) ("By now it almost goes without saying that we should not be adding

to the prison population during the COVID-19 pandemic if it can be avoided.  Several recent

court rulings have explained the health risks—to inmates, guards, and the community at large—

created by large prison populations.  The chaos has already begun inside federal prisons . . . ."

(citations omitted); *United States v. Barkman*, No. 3:19-cr-0052 (RCJ), 2020 U.S. Dist. LEXIS

45628 (D. Nev. Mar. 17, 2020).  In *United States v. Martin*, the Court specifically explained that

exposure to COVID-19 can lead to "serious (potentially fatal, if the detainee is elderly and with

underlying medical complications) illness."  No. 19-cr-140-13, 2020 WL 1274857, at *2 (D. Md.

Mar. 17, 2020) (noting that incarcerated individuals "may well" have a cognizable substantive

due process claim in such a scenario).

Moreover, Petitioners' medical needs remain unmet. As discussed below, the record demonstrates that ICE has not taken any action to address the particular risks COVID-19 poses to high-risk individuals like the Petitioners here. And the Department of Homeland Security's own "medical subject matter experts" state that the agency has a "track record . . . of failing to develop early detection and containment protocols for infectious diseases outbreaks" and point out problems with detention facilities' protocols surrounding screening, testing, and isolation. Letter from Dr. Scott Allen and Dr. Jody Rich at 1, 5;[2] *see also Jolly v. Coughlin*, 76 F.3d 468, 477 (2d Cir. 1996) ("[C]orrectional officials have an affirmative obligation to protect inmates from infectious disease") (citing cases). In short, on the undisputed factual record in this case, Petitioners have met their burden on the first prong.

### C. On This Record, the Government Has Shown Deliberate Indifference to Petitioners' Medical Needs

The Court next moves to the inquiry's second prong, which requires challengers to show that the defendant acted with deliberate indifference to the challenged conditions. This prong "has a . . . complicated history in this Circuit." *Charles*, 925 F.3d at 86. To start, although courts have often referred to this as the "subjective prong" of the inquiry, it is "better classified as a '*mens rea* prong' or 'mental element prong.'" *Darnell*, 849 F.3d at 29. Indeed, the phrase "subjective" in this prong "might be a misleading description in that . . . 'deliberate indifference' roughly means 'recklessness,' but 'recklessness' can be defined subjectively (what a person actually knew, and disregarded), or objectively (what a reasonable person knew, or should have known)." *Darnell*, 849 F.3d at 35 (citing *Farmer v. Brennan*, 511 U.S. 825, 836–37 (1994)); *see also Charles*, 925 F.3d at 86 (deliberate indifference "can be shown by something akin to recklessness, and does not require proof of a malicious or callous state of mind"). In short, a

---

[2] Both Dr. Allen and Dr. Rich "currently serve as medical subject matter experts for the Department of Homeland Security's Office of Civil Rights and Civil Liberties." Allen Letter at 1–2.

petitioner establishes a claim for deliberate indifference by "prov[ing] that the defendant-official acted intentionally to impose the alleged condition, or recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though the defendant-official knew, or should have known, that the condition posed an excessive risk to health or safety." *Darnell*, 849 F.3d at 35. This is a question of fact, susceptible to proof by circumstantial evidence. "Whether the state knew or should have known of the substantial risk of harm to the detainee is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence." *Charles*, 925 F.3d at 87.

To begin, Petitioners put forward undisputed evidence that ICE had *actual knowledge* of their serious, unmet medical conditions. Each Petitioner submitted a letter to ICE detailing his or her medical conditions and explaining that those conditions predisposed them to higher risk from contracting COVID-19. As Petitioners explain, they each notified the Government about the particular circumstances of their cases and their high risk of harm. Br. at 17; *see* Ostolaza Decl. ¶¶ 8, 12, 18–19; Kim Decl. ¶¶ 10, 21, 26, 34. And they did so multiple days before this litigation began. Petitioner Morocho submitted his letter to the Government on March 19, Petitioner Madrid on March 17, Petitioner Miranda on March 16, and Petitioner Otero on March 13. Mar. 26 Hr'g Tr. at 27:9–11. The Government was thus aware of the petitioners' medical conditions and the serious harm that COVID-19 posed to them.

Nevertheless, the Government can point to *no specific action* that it took in direct response to this serious, unmet medical need. Indeed, the record contains no evidence that the Governent took any specific action to prevent the spread of COVID-19 to high-risk individuals, like the Petitioners, currently being held in civil detention. It has not isolated these high-risk individuals. It has not created special safety or hygiene protocols for them or for staff interacting

with them to follow.  It has not implemented a protocol to test individuals coming into jails or individuals who are in jails, either for COVID-19 itself or even for a high fever.  And of course, it has not released the Petitioners at issue here, even though doing so is within the agency's sound discretion.  The Government could, for example, put in place a procedure to identify high-risk detainees and use its discretion to release them, taking into account as appropriate risk of flight and danger to the community, but it has not taken such a course.  Instead, on the record before the Court, it has no system to even determine which of its detainees face heightened risk from COVID-19, let alone release them.

To be sure, the record demonstrates that ICE has taken some steps in response to COVID-19.  It has suspended inmate visits, increased sanitization of certain areas, and begun to provide hand sanitizer to inmates.  *See* Mishori Decl. ¶ 35; *see also* Moon Decl. ¶ 14 (noting that Petitioners' jails have, among other things, "increased sanitation frequency and provide [various] sanitation supplies.").  However, Dr. Mishori contends that "[n]one of these steps are adequate to mitigate the transmission of the virus when there's already documented community-based transmission, and spread of coronavirus from staff, vendors, or contractors."  Mishori Decl. ¶ 35. The Government puts forward no evidence contesting that assertion.  And even the steps that the Government has taken do nothing to alleviate the *specific*, *serious*, and *unmet* medical needs of the high-risk Petitioners in this matter.  And it is on the Petitioners in this case that the Court must direct its attention when conducting this constitutional inquiry, not on all inmates generally. *See Johnson v. Wright*, 412 F.3d 398, 404 (2d Cir. 2005) (holding that even if a policy is "generally justifiable," its application to a particular individual could still "amount[] to deliberate indifference to plaintiff's medical needs").  As to the specific and especially vulnerable detainees at issue in this litigation, the Government has taken no preventative action at all.

Petitioners have also identified a series of problems that routinely plague attempts to provide adequate medical care to ICE detainees. For example, they note that ICE often fails to keep "accurate and sufficient medical records," which makes it "more difficult for the facilities to identify vulnerable individuals in order to both monitor their health and protect them from infection." Mishori Decl. ¶ 41. Similarly, ICE facilities have "[i]nadequate screening and testing procedures," *id.*, making it more difficult to prevent the spread of COVID-19. Once again, the Government has taken no measures to alleviate these problems with respect to this specific high-risk population.

In short, the Government knew of a serious medical risk to Petitioners, but took no action in response. The Second Circuit has found such facts, albeit at a different procedural posture, to be sufficient to support a claim for deliberate indifference. In *Charles*, the Second Circuit found plaintiffs' complaint sufficient on this prong in part because it alleged that defendants had "diagnosed Plaintiffs, maintained their medical records, created treatment plans for them, and prescribed" them medication, and thus were "aware" of plaintiffs' medical conditions. *Charles*, 925 F.3d at 88.

In a recent decision, Judge Torres came to the same conclusion in a factually similar case. *See Basank v. Decker*, No. 20-cv-2518 (AT), (S.D.N.Y. Mar. 26, 2020), Dkt. No. 11. In *Basank*, petitioners were detained by ICE at some of the same facilities at issue in this case—the jails of Bergen and Essex Counties. *Id.* The petitioners, like those here, suffered "from chronic medical conditions" and faced "an imminent risk of death or serious injury in immigration detention if exposed to COVID-19." *Id.* The petitioners thus sought a temporary restraining order directing their immediate release from ICE custody. As is true in this litigation, the Government in *Basank* "could [not] provide the Court with any information about steps taken to protect high-

risk detainees like Petitioners." *Id.* The court therefore held "that Petitioners are likely to succeed on the merits of their due process claim that Respondents knew or should have known that Petitioners' conditions of confinement pose excessive risks to their health." *Id.*

This Court now concludes, on the record before it, that Petitioners have demonstrated a likelihood of success on their claim the Government's actions constitute deliberate indifference to Petitioners' medical needs, and thus violate the Fifth Amendment's substantive due process guarantee. The Court does not come to this preliminary conclusion lightly, and it recognizes that Respondents face extremely difficult and changing circumstances as they confront an extraordinary public-health emergency. In so concluding, the Court notes that a different conclusion might follow if the Government had introduced any evidence of actions it took in response to the particular risk COVID-19 poses to high-risk individuals like the Petitioners here. On this record, however, the Respondents took no action at all, and that is insufficient to satisfy their Constitutional obligations.

## VI. LIKELIHOOD OF SUCCESS ON THE MERITS OF PROCEDURAL DUE PROCESS CLAIM

The Court next considers Petitioners' separate argument that Respondents are violating Petitioners' rights to procedural due process under the Fifth Amendment.

To understand Petitioners' argument, some background on civil immigration detention is needed. Immigrants detained under 8 U.S.C. § 1226 are entitled to a bond hearing. *See Sajous v. Decker*, No. 18-CV-2447 (AJN), 2018 WL 2357266, at *1 (S.D.N.Y. May 23, 2018); *Linares Martinez v. Decker*, No. 18-CV-6527 (JMF), 2018 WL 5023946, at *4 (S.D.N.Y. Oct. 17, 2018) (noting that a "slew of cases" applies this protection to immigrants detained under both § 1226(a) and § 1226(c)). In these bond hearings, immigration judges, applying binding Board of Immigration Appeals precedent, require detainees to bear the burden of proving that they are not

a danger to the community or a flight risk.  And immigration judges, again applying binding

agency precedent, do not need to consider alternatives to detention or an immigrant's ability to

pay in making bond determinations.  *See generally Matter of Guerra*, 24 I. & N. Dec. 37, 38–40

(B.I.A. 2006).  Myriad courts in this Circuit, however, have found that these procedures violate

the Fifth Amendment's due process guarantee, ordered the Government to bear the burden by

clear and convincing evidence, and directed immigration judges to consider alternatives to

detention.  *See, e.g., Guerrero v. Decker*, No. 19 Civ. 11644 (KPF), 2020 WL 1244124, at **3–5

(S.D.N.Y. Mar. 16, 2020) (citing cases).  This Court has reached the same conclusion.  *See

Medley v. Decker*, No. 18-cv-7361 (AJN), 2019 WL 7374408, *4 (S.D.N.Y. Dec. 11, 2019).

        The relevant procedural right in this case, however, does not involve only the allocation

of the burden in a bond hearing or whether the judge should consider alternatives.  Instead, the

relevant right is to a timely bond hearing that takes account of the unique circumstances of these

Petitioners in light of the COVID-19 pandemic.

        Petitioners have put forward evidence that immigration courts are, due to the COVID-19

pandemic, struggling to manage their caseload, hold timely hearings, and consider relevant

evidence.  The Government does not contest these factual allegations, nor does it offer any

evidence to contradict them.  At the very least, Petitioners are entitled to *a* bond hearing.  And

the Government contends that it is providing all the process Petitioners are entitled because "the

petitioners each have bond hearings (or master calendar hearings at which they may seek bond . .

.) in *the coming weeks*.").  Opp. at 14.  But the scheduling of hearings alone does not end the

Court's due-process inquiry.  Procedural due process "is not a technical conception with a fixed

content unrelated to time, place and circumstances, . . . but is flexible and calls for such

procedural protections as the particular situation demands."  *Martinez v. McAleenan*, 385 F.

Supp. 3d 349, 363 (S.D.N.Y. 2019) (quoting *Mathews v. Eldridge*, 424 U.S. 319, 334 (1976)).

The particular circumstances of this case require expeditious bond hearings. As the Court has

discussed repeatedly, Petitioners are uniquely vulnerable to COVID-19. The longer they spend

in civil detention, the greater their chances of contracting the disease. A hearing *weeks* from now

may be no relief at all, because Petitioners may contract COVID-19 in the interim and face

serious health consequences—including death. Moreover, given the circumstances, the

immigration court conducting the bond hearing should take into account the particular health

dangers COVID-19 poses to these Petitioners. In short, therefore, the Court concludes that

Petitioners have demonstrated a likelihood of success on their claim that the Due Process Clause

entitles Petitioners to an expeditious bond hearing that considers the individualized risk that

COVID-19 poses to their health.

## VII.     BALANCE OF THE EQUITIES AND PUBLIC INTEREST

Where the Government is the opposing party, the final two factors in the temporary

restraining order analysis—the balance of the equities and the public interest—merge. *Planned*

*Parenthood of New York City, Inc. v. U.S. Dep't of Health & Human Servs.*, 337 F. Supp. 3d

308, 343 (S.D.N.Y. 2018). For the reasons stated below, Petitioners have demonstrated that the

balance of equities and the public interest clearly weigh in their favor.

First, as this Court has previously stated, the "public interest is best served by ensuring

the constitutional rights of persons within the United States are upheld." *Sajous v. Decker*, No.

18-cv-2447 (AJN), 2018 WL 2357266, at *13 (S.D.N.Y. May 23, 2018). As discussed above,

Petitioners have established a likelihood of success on the merits on their substantive and

procedural due process claims. Accordingly, the public interest is best served by enjoining

further likely violations of Petitioners' rights through their release.

Furthermore, both Petitioners and the public benefit from ensuring public health and safety, *see Grand River Enterprises Six Nations, Ltd. v. Pryor*, 425 F.3d 158, 169 (2d Cir. 2005) (referring to "public health" as a "significant public interest"), and, under the circumstances, the public interest in ensuring public health is also best served by Petitioners' release. As their medical expert points out, a COVID-19 outbreak at a detention facility could "quickly overwhelm[] the already strained health infrastructure within the facility," which would then place strain on the surrounding community hospitals. *See* Mishori Decl. ¶ 26. Accordingly, "reducing the size of the population in jails and prisons . . . reduc[es] the level of risk both for those within those facilities and for the community at large." *Id.* ¶ 45; *cf. United States v. Stephens*, No. 15-cr-95 (AJN), 2020 WL 1295155, at *2 (S.D.N.Y. Mar. 18, 2020). Indeed, "where detainees are released from high risk congregate settings, the tinderbox scenario of a large cohort of people getting sick all at once is less likely to occur, and the peak volume of patients hitting the community hospital would level out." Allen Letter at 4.

A comprehensive assessment of these factors requires the Court to balance the public interest in Petitioners' release articulated above—including the harm that they and others may face if they remain detained—with any public interest in Petitioners' continued detention—including any risk of flight or danger to the community that Petitioners pose. The Government concedes that the record does not contain any evidence that Petitioners pose a risk of flight.[3] Mar. 26 Hr'g Tr. at 47:9–18. Moreover, the only evidence of Petitioners' dangerousness that the

_____

[3] Even if the Government is correct that Petitioners entered this country without authorization, that does not necessarily make them a flight risk. Petitioners have submitted evidence that they each have significant ties to their local communities in this country. *See* Ostolaza Decl. ¶¶ 4–19; Kim Decl. ¶¶ 23–25.

Government offers is based on Petitioners' prior criminal records.  Mar. 26 Hr'g Tr. at 47:5–8; *see also* Opp. at 2–4.  But Petitioners, who are detained pursuant to § 1226(a), at most have relatively limited criminal histories, with only two convictions for disorderly conduct, a non-criminal violation, between them.[4]  *See* Mar. 26 Hr'g Tr. at 48:16–49:19.

In light of the fact that the Government has offered no evidence that Petitioners pose a risk of flight and limited evidence that they pose a danger to the community, it is clear that the Government's interest—and thus the public interest—in Petitioners' continued detention is far outweighed by the public interest in their release in light of the rapidly-evolving public health crisis engendered by the spread of COVID-19.  Accordingly, the balance of the equities and the public interest weigh in favor of granting Petitioners' motion for a temporary restraining order.

## VIII.  REMEDIES

In light of the conclusion that Petitioners are likely to succeed on the merits of their substantive and procedural due process claims, the Court must determine the appropriate interim remedy.  In *Mapp v. Reno*, the Second Circuit held "that the federal courts have inherent authority to admit to bail individuals properly within their jurisdiction" including immigration detainees petitioning for habeas relief.  241 F.3d 221, 226 (2d Cir. 2001).  But "this power is a limited one, to be exercised in special cases only."  *Id.*  To determine a petitioner's "fitness for bail" pending adjudication of a habeas petition, the Court "must inquire into whether 'the habeas petition raises substantial claims and [whether] extraordinary circumstances exist[] that make the grant of bail necessary to make the habeas remedy effective.'"  *Id.* at 230 (quoting *Iuteri v.*

---

[4] Arrests of Petitioners Madrid and Otero resulted in non-criminal convictions for disorderly conduct.  Another arrest of Petitioner Otero resulted in an adjournment in contemplation of dismissal. All charges arising from an arrest of Petitioner Miranda were dismissed and sealed just three months after arrest.  Misdemeanor menacing charges remain pending against Petitioner Sumba.  *See* Mar. 26 Hr'g Tr. at 48:16–49:19.

*Nardoza*, 662 F.2d 159, 161 (2d Cir. 1981)) (alterations in original).  Additionally, some courts

applying *Mapp* also consider "whether the petitioner has demonstrated a likelihood of success on

the merits of his or her petition."  *Boddie v. New York State Div. of Parole*, No. 08-cv-9287

(LAP), 2009 WL 1531595, at *1 (S.D.N.Y. May 28, 2009).  The parties agree that *Mapp* and the

standard articulated therein govern the proper remedy here.[5]

For the reasons stated above, the Court finds that Petitioners have raised substantial

claims and demonstrated a likelihood of success on the merits for both their deliberate

indifference and procedural due process claims.  The Court thus turns to whether the deliberate

indifference and procedural due process claims each involve "extraordinary circumstances" that

"make the grant of bail necessary to make the habeas remedy effective."  *Mapp*, 241 F.3d at 230

(quotation omitted).

### A. Deliberate Indifference

Severe health issues have been the prototypical but rare case of extraordinary

circumstances that justify release pending adjudication of habeas.  *See S.N.C. v. Sessions*, No.

18-cv-7680 (LGS), 2018 WL 6175902, at *6 (S.D.N.Y. Nov. 26, 2018); *Kiadii v. Decker*, No.

18-cv-1584 (AT), 2018 WL 10456549, at *2 (S.D.N.Y. Mar. 2, 2018); *Skakel v. Murphy*, No.

3:07-cv-1625 (PCD), 2009 WL 2253175, at *5 (D. Conn. July 27, 2009).  The aim of the

deliberate indifference claim is to ensure constitutionally adequate protection from COVID-19 in

light of Petitioners' underlying health conditions.  As discussed above, the Court has found that,

with regard to the particular circumstances of this case, there is a likelihood that Petitioners are

being subjected to unconstitutional conditions of confinement, and that the risks posed by

---

[5] The Government contends that it is not relevant whether Petitioners pose a danger to the
community or a risk of flight.  Even if the Court were to consider these factors, they would
reinforce its decision to grant temporary release, as discussed above.  *See supra* Section VII.

COVID-19 are imminent.  If Petitioners were to remain detained, they would face a significant risk that they would contract COVID-19—the very outcome they seek to avoid.  Release is therefore necessary to "make the habeas remedy effective."  *Mapp*, 241 F.3d at 230 (quotation omitted); *see also Calderon Jimenez v. Wolf*, No. 18-cv-10225 (MLW), Dkt. No. 507-1, at 3–4 (D. Mass. Mar. 26, 2020) (granting release under *Mapp* where the risk of a COVID-19 outbreak in the relevant prison constituted an extraordinary circumstance).

### B.  Procedural Due Process

Although the determination above is sufficient to resolve this motion, the Court in the alternative likewise and independently finds extraordinary circumstances with regards to Petitioners' procedural due process claims.  Typically, courts do not find extraordinary circumstances for habeas petitions where a constitutionally adequate bail hearing is the relief sought.  *See, e.g.*, *Reid v. Decker*, 19-cv-8393 (KPF), 2020 WL 996604, at *13 (S.D.N.Y. Mar. 2, 2020); *Fernandez Aguirre v. Barr*, 19-cv-7048 (VEC), 2019 WL 3889800, at *4 (S.D.N.Y. Aug. 19, 2019).  But these are not normal circumstances.  COVID-19 has placed the Petitioners in a Catch-22.  They seek a constitutionally adequate bond hearing where they can attempt to address not only their entitlement to bond on the traditional factors, but also the heightened risk that they will contract COVID-19 due to their incarceration, as well as the potentially deadly consequences that may follow in light of their serious medical conditions.  But, as discussed above, Petitioners have been forced to wait and remain detained.  This delay increases the probability that they will contract COVID-19 in the interim.  If Petitioners contract COVID-19 and suffer serious health impacts or even death as a result of their underlying medical conditions, the claim that they seek to pursue in the bond hearing would effectively be moot.  *See Umana*

*Jovel v. Decker*, No. 20-cv-308 (GBD) (SN), 2020 U.S. Dist. LEXIS 52095, at *12-*16 (S.D.N.Y. Mar. 24, 2020).

Furthermore, Petitioners' underlying health conditions likely require them to receive expeditious bond hearings. Requiring Petitioners to wait a significant additional period of time in detention is an inadequate remedy given their exceptionally imminent health risks. Finally, the public health crisis caused by COVID-19 has limited the ability of detainees to get in contact with counsel in order to prepare for a bond hearing. *See, e.g.*, *See* Ostolaza Decl. ¶ 20; Kim Decl. ¶ 32; Oshiro Decl. ¶ 12.

In order to secure a meaningful bond hearing and therefore preserve the effectiveness of the remedy sought on habeas, Petitioners must be released until they receive their bond hearings. *See S.N.C.*, No. 18-cv-7680 (LGS), 2018 WL 6175902, at *6 (releasing under *Mapp* where detention contributed to mental health deterioration such that petitioner had to be released "before her health decline[d] past the point at which she [was] unable" to pursue her habeas claim). Moreover, the bond hearings must be constitutionally adequate. In addition to considering the serious risk of harm to Petitioners posed by COVID-19, the immigration court must place the burden on the Government to prove, by clear and convincing evidence that Petitioners either pose a danger to the community or a risk of flight. *See Medley v. Decker*, No. 18-cv-7361 (AJN), 2019 WL 7374408, at *4 (S.D.N.Y. Dec. 11, 2019).

## IX.    CONCLUSION

For the foregoing reasons, the Court GRANTS Petitioners' motion for a temporary restraining order. The Court therefore orders Respondents to immediately RELEASE Petitioners on reasonable conditions. The parties are hereby ordered to meet and confer and propose reasonable bond conditions no later than 12 PM on March 27, 2020.

This resolves Dkt. No. 16.

SO ORDERED.


Dated: March ___27___, 2020
New York, New York

_____
ALISON J. NATHAN
United States District Judge